**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                    :        Hon. Joseph H. Rodriguez
JAY RUTHERFORD,                     :
          Petitioner,               :        Civil Action No. 02-3131
                                    :
     V.                             :        **OPINION**
                                    :
ROY L. HENDRICKS, *et al*.,         :
          Respondents.              :
_____    :

**RODRIGUEZ,** SENIOR DISTRICT JUDGE:

Jay Rutherford ("Rutherford"), who is confined at the New Jersey State Prison in

Trenton, New Jersey, filed a pro se Petition for a Writ of Habeas Corpus pursuant to 28

U.S.C. § 2254(a), raising several grounds for relief.  The State filed an Answer opposing

the Petition.  For the reasons discussed below, this Court will deny habeas relief, dismiss

the Petition, and decline to issue a certificate of appealability.  See 28 U.S.C. §§ 2254(a)

and (d); 2253 (c)(2).

## I.  BACKGROUND

On June 22, 1995, Rutherford was convicted of first degree aggravated

manslaughter in violation of N.J.S.A. 2C: 11-4a (count one), first degree felony murder in

violation of N.J.S.A. 2C: 11-3a(3) (count two), first degree robbery in violation of

N.J.S.A. 2C: 15-1a(1) (count three), third degree unlawful possession of a weapon

(handgun) in violation of N.J.S.A. 2C: 39-5b (count four), and second degree possession

of a weapon for an unlawful purpose in violation of N.J.S.A. 2C: 39-4a (count five).  (See

RA8.)  On August 25, 1995, The Honorable Samuel D. Natal, J.S.C. ("Judge Natal") denied Rutherford's motion for a new trial, and sentenced him to a term of life imprisonment without parole eligibility for thirty (30) years as to count two (felony murder) and five (5) years imprisonment without parole eligibility for two and one half (2 ½) years as to count four (unlawful possession of a handgun).  (RA11; RA10: 7T38-2 to 8.)  However, the count four sentence was to run concurrently with the count two sentence.  (RA11; RA10: 7T38-9.)  The court merged, for sentencing purposes, counts one (aggravated manslaughter), three (robbery), and five (possession of a weapon for an unlawful purpose) into count two.  (See RA11.)

Rutherford appealed his conviction to the Superior Court of New Jersey, Appellate Division ("Appellate Division") and argued that: 1) the trial court erred when it refused to provide the jury with transcripts or full read-backs of the testimony of three witnesses; and 2) the trial court erred when it charged the jury with the law of accomplice liability on the second day of deliberations.  (See RA14.)  On May 13, 1998, the Appellate Division denied Rutherford's claims and affirmed his conviction.  (See RA19.)  On or about June 10, 1998, Rutherford filed a Petition for Certification with the New Jersey Supreme Court, which contended that the Appellate Division erred in rejecting his claims on appeal.  (See RA21.)  On September 11, 1998, the New Jersey Supreme Court denied Rutherford's Petition for Certification.  (See RA23.)

Rutherford next filed a Petition for Post-Conviction Relief ("PCR") on or about January 12, 1999.  (See RA24.)  Rutherford's argument in support of relief centered around an ineffective assistance of counsel claim that alleged the following: 1) that counsel failed to enter into plea negotiations with the State and failed to inform Rutherford of the State's plea offer; 2) that counsel failed to adequately advise Rutherford of a possible conflict of interest, leading Rutherford to unknowingly waive his right to conflict-free counsel; and 3) that counsel failed to call certain defense witnesses and discuss trial strategy with Rutherford.  (See RA25.)

On October 1, 1999, Judge Natal held a hearing regarding Rutherford's PCR petition.  As an initial matter, he refused to consider the claim relating to the alleged failure of counsel to call certain witnesses at trial because Rutherford did not comply with N.J. R. Gen. Application 1:6-6[1] as interpreted by State v. Cummings, 728 A.2d 307, 315 (N.J. Super. Ct. App. Div. 1999).  (RA28: 8T5-20 to 9-14; RA28: 8T94-13 to 95-9.)  As a result, the witnesses were not permitted to testify at the PCR hearing.  (RA28: 8T8-23 to 9-13.)  As to the remaining claims, Judge Natal ruled against Rutherford and concluded

---

[1] N.J. R. Gen. Application 1:6-6 provides:

If a motion is based on facts not appearing of record, or not judicially noticeable, the court may hear it on affidavits made on personal knowledge, setting forth only facts which are admissible in evidence to which the affiant is competent to testify and which may have annexed thereto certified copies of all papers or parts thereof referred to therein. The court may direct the affiant to submit to cross-examination, or hear the matter wholly or partly on oral testimony or depositions.

that his counsel was not ineffective with respect to plea negotiations, (RA28: 8T93-3 to 5), nor as to a possible conflict of interest, (RA28: 8T94-4 to 7).  On October 19, 1999, Judge Natal denied Rutherford's Petition for Post-Conviction Relief.  (See RA29.)

Rutherford then appealed the denial of his PCR claims to the Appellate Division. (See RA30.)  On appeal, he raised essentially the same claims as at the PCR hearing, arguing that the PCR court erred in concluding that his counsel was not ineffective.  (See RA32.)  On February 11, 2002, the Appellate Division affirmed the denial of post-conviction relief, having concluded that Rutherford's arguments during the hearing were "without sufficient merit to warrant extensive discussion in a written opinion."  (See RA34.)  While Rutherford subsequently filed a Petition for Certification with the New Jersey Supreme Court, (see RA35), this Petition was denied, (see RA37).

On June 27, 2002, Rutherford filed the instant Petition, which asserts various grounds for federal habeas relief.[2]  First, Rutherford argues that he was denied due process and the right to a fair trial when Judge Natal refused a jury request to view transcripts of trial testimony.  (Pet. ¶ 12.A.)  Second, Rutherford claims that he was denied due process when, on the second day of deliberation, Judge Natal charged the jury

_____

[2] The Respondents concede that Rutherford has complied with the exhaustion requirements of 28 U.S.C. § 2254(b)(1).  See Answer for Respondents at 5 n.1.  As the Respondents note, Rutherford's various grounds for habeas relief are essentially restatements of certain points raised on his direct appeal of conviction and on appeal from the denial of his Petition for Post-Conviction Relief.  Id.  In both appeals, Rutherford filed Petitions for Certification with the New Jersey Supreme Court.  Id.

with the law of accomplice liability.  (Pet. ¶ 12.B.)  Specifically, Rutherford argues: 1) that there was insufficient evidence to warrant the charge; 2) that the charge had a coercive effect on the jury; and 3) that he was denied an opportunity to present a defense as to the issue.  (Id.)  Third, Rutherford asserts two theories of ineffective assistance of counsel.  Specifically, Rutherford claims that counsel: 1) failed to negotiate a plea bargain with the State and failed to keep Rutherford abreast of possible plea offers, (Pet. ¶ 12.C); and 2) did not properly advise Rutherford of a possible conflict of interest, which lead Rutherford to unknowingly waive his right to conflict-free counsel, (Pet. ¶ 12.D).  Finally, Rutherford asserts that Judge Natal's ruling as to his PCR claims was sufficiently erroneous to warrant habeas relief.  (Pet. ¶ 12.E.)  Specifically, Rutherford claims that Judge Natal erred with respect to the ineffective assistance of counsel claims.  (Id.) Further, Rutherford asserts that Judge Natal was incorrect in refusing to allow the testimony of certain witnesses during the PCR hearing.  (Id.)

On December 11, 2002, Respondents filed their Answer, contesting each of the grounds for habeas relief asserted by Rutherford.

## II.  DISCUSSION

### A.    Standard of Review for a § 2254 Petition in district court

The standard of review of a § 2254 Petition in district court is mandated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to

-5-

> any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Marshall v. Hendricks, 307 F.3d 36, 50 (3d Cir. 2002). A federal

habeas court must presume that a state court's findings of fact are correct. See 28 U.S.C.

§ 2254(e)(1). The petitioner bears the burden of rebutting the presumption of correctness

by clear and convincing evidence. Id; Campbell v. Vaughn, 209 F.3d 280, 285 (3d Cir.

2000).

Section 2254(d)(1) defines two categories of cases where state prisoners can obtain

habeas corpus relief for claims adjudicated on the merits in state court: 1) where the

relevant state court decision was *contrary to* the clearly established federal law as

determined by the Supreme Court; or 2) where it involved an *unreasonable application* of

such law (emphasis added).

Under the first category, a state court decision is contrary to Supreme Court

precedent under § 2254(d)(1) where the state court reached a "conclusion opposite to that

reached by [the Supreme] Court on a question of law or if the state court decides a case

differently than [the Supreme] Court has on a set of materially indistinguishable facts."

Marshall, 307 F.3d at 51 (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). Under

the second category, a state court decision is an unreasonable application under §

2254(d)(1) if the court "identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Gattis v. Snyder, 278 F.3d 222, 228 (3d Cir. 2002) (citing Williams, 529 U.S. at 407).

It is worth emphasizing that the unreasonable application test is an objective one. Gattis, 278 F.3d at 228. Thus, a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly. Wiggins v. Smith, 539 U.S. 510, 520 (2003); Gattis, 278 F.3d at 228. Rather, habeas relief is appropriate only where the state court's application of federal precedent was objectively unreasonable. Wiggins, 539 U.S. at 520-21 (citing Williams, 529 U.S. at 409).

Finally, the AEDPA amended the federal habeas statute to limit the availability of new evidentiary hearings in the district court. 28 U.S.C. § 2254(e)(2); Campbell, 209 F.3d at 287 (holding that if the state court made factual findings to which federal courts must defer, then a new evidentiary hearing "would be forbidden under the precepts of §2254 (e)(2) . . ."). The factual findings of the state court are sufficient in this case to not warrant an evidentiary hearing.

**B.     Rutherford's claim that he was denied due process of law and deprived of a fair trial because of the trial court's handling of a jury request to view certain trial transcripts is without merit.**

Rutherford contends that he was denied due process and deprived of a fair trial in light of Judge Natal's handling of a jury request to view transcripts of the testimony of three witnesses.  (Pet. ¶ 12.A.)  Specifically, Rutherford claims that Judge Natal acted improperly when he told the jury that there were no transcripts available.  (Id.) Rutherford further claims that Judge Natal was wrong to admonish the jury that it could ask specific questions relating to the testimony, the answers to which the court would then locate in the reporter's notes.  (Id.)  It seems Rutherford would rather have had Judge Natal respond to the jury request for transcripts with a full read-back of the testimony of each of the witnesses in question.

The Third Circuit has held that a trial judge had broad discretion in determining whether to accede to a jury's request for reading of testimony.  United States v. Zarintash, 736 F.2d 66, 69-70 (3d Cir. 1984) (citing United States v. Chrzanowski, 502 F.2d 573, 577 (3d Cir. 1974); United States v. Rabb, 453 F.2d 1012 (3d Cir. 1971); United States v. Chicarelli, 445 F.2d 1111 (3d Cir. 1971)).  This discretion is premised on two considerations:

> 1) that requests to read testimony may slow the trial where the relevant testimony is lengthy; and
> 2) that reading only a portion of the testimony may cause the jury to give that portion undue emphasis.

Zarintash, 736 F.2d at 70 (citing Rabb, 453 F.2d at 1013-14).  Thus, a trial judge abuses

his discretion where the refusal to read requested testimony is not supported by one of these reasons.  Zarintash, 736 F.2d at 70.  In a more recent case, the Third Circuit has extended this holding so as to give trial courts the same limited discretion in considering jury requests to view trial transcripts.  See United States v. Bertoli, 40 F.3d 1384, 1400 (3d Cir. 1994).  However, the Bertoli court expressly warned that its holding was not to be taken as an instruction that a trial court must require transcript preparation when such transcripts are not otherwise available.  Id. at 1400 n.9.

In the instant case, there is nothing to indicate that Judge Natal abused his discretion in his handling of the jury request for transcripts of testimony.  As he indicated during his initial charge to the jury, there were no transcripts available for viewing by the jury.  (RA6: 5T114-10 to 11.)  The jury, nonetheless, sent the court a note which read, "We, the jury, request a transcript of the testimonies of Saleem Matthews, Tanya Money, and [Trooper Randolph] Toth."  (RA6: 5T119-11 to 14.)  He promptly informed counsel of the request out of the presence of the jury.  He indicated to counsel that he would offer the jury to have specific portions of Matthews and Toth's testimony read back to it. (RA6: 5T119-17 to 20.)  This, however, presented a problem as to Tanya Money's testimony because the court reporter who took it was on vacation at the time of the jury request.  (RA6: 5T119-21 to 23.)  He suggested that if the jury was looking for specific information, he and each counsel could possibly refer to their personal notes and agree amongst themselves what the relevant testimony was. (RA6: 5T119-24 to 120-2.)

-9-

Defense counsel affirmatively agreed.  (RA6: 5T120-14.)  Judge Natal then recalled the jury and instructed it as follows:

> Members of the jury, as I told you in my charge, there are no transcripts.  For a transcript to be prepared– takes weeks to have a transcript prepared.  There are no transcripts.  Therefore, I would ask you to try and recall the testimony, if you can.  If there's anything specific you're looking for, please let us know what you're looking for and it will take some time, but I will– depending on what you're asking for, I will see whether or not that particular part can be found from the shorthand notes of the reporters, if you're looking for something specific.  If not, I would indicate you should rely upon your combined recollection of what the testimony was, but there are no transcripts to give you.

(RA6: 5T121-2 to 13.)

Later the same day, the court received another note from the jury asking specific questions about the testimony of Trooper Toth, Money, and Charlotte Hendricks, one of Rutherford's alibi witnesses.  (RA6: 5T122-7 to 15.)  Again, he informed counsel of the note out of the presence of the jury.  He then suggested that he and counsel could possibly agree on the answers to the jury's questions without necessitating a full read-back of the entire testimony.  (RA6: 5T123-4 to 7.)  Counsel and Judge Natal then proceeded to discuss each question, and all three agreed on the substance of each answer without dispute.  (RA6: 5T123-8 to 125-4.)  In response to defense counsel's concern that the jury might take the court's answers to its questions as undisputed fact, he indicated that he would instruct the jury that its own recollection as to the substance of the testimony controlled.  (RA6: 5T125-17 to 126-1.)  Again, defense counsel affirmatively agreed.  (RA6: 5T126-2 to 4.)

Judge Natal then brought out the jury and instructed it that while he would answer the jury's questions based on his own notes, the jury's recollection of the testimony controlled.  (RA6: 5T127-7 to 14.)  He then answered each of the jury's questions, reiterating his instruction that the jury's recollection was controlling after each answer.  (RA6: 5T127-15 to 129-2.)  After finishing answering all the questions, he again told the jury that its own recollection controlled as to the testimony it heard.  (RA6: 5T129-8 to12.)  Defense counsel, again, indicated that the court's response was appropriate.  (RA6: 5T129-3 to 5.)

Judge Natal's handling of the jury request did not constitute an abuse of discretion given that one of the court reporters was unavailable for a read-back.  Rather, both considerations under Zarintash for giving a trial court discretion in dealing with requests for transcripts and testimony read-backs are implicated by the facts of this case.  The record indicates that he dealt with the jury's request in a manner that expedited a response which even defense counsel agreed was substantively acceptable.  The court thereby sought to avoid the potentially significant delays in the deliberation process that would accompany unnecessarily reading back to the jury the entirety of the testimony given by the three witnesses of interest.  In addition, Judge Natal's response to the specific questions ensured that no particular piece of testimony was given undue emphasis as he instructed several times that the jury's recollection of the testimony controlled.  Further, as pointed out by the Appellate Division on review, the absence of one of the court

reporters made a read-back of all testimony "at least very cumbersome, if not entirely impracticable, and posed an additional possibility of unequal compliance with the several jury requests in that some read backs might have been possible while some would not." (RA19: slip op. at 6-7.)

When Rutherford appealed his conviction, the Appellate Division held that the trial court had exercised its discretion reasonably.  (Id. at 7.)  The Appellate Division went on to state that Judge Natal's summarization of testimony was accurate as to the jury's principle questions but noted that there was a partial inaccuracy as to one statement made by the judge in relation to the testimony of Charlotte Hendricks.  (Id.)  However, the Appellate Division found this inaccuracy "clearly harmless" in light of the jury's "obvious disbelief" of Rutherford's alibi witnesses.  (Id.)  Further, the Appellate Division noted that the trial court repeatedly stressed to the jury that the jury's, rather than the court's, recollection of the testimony controlled.  (Id. at 8.)  The Appellate Division held that there was no plain error warranting a reversal because defense counsel acquiesced in the judge's summary of the testimony.  (Id.)

Judge Natal did not abuse his discretion in handling the jury request for testimony transcripts as he did.  The Appellate Division's affirmance of the trial court's decision is therefore neither contrary to, nor an unreasonable application of, Supreme Court or Third Circuit case law.  For these reasons, Rutherford's application for habeas relief is denied as to these claims.

-12-

**C.     Rutherford's claim that he was denied due process and deprived of a
fair trial when the court charged the jury on accomplice liability after
deliberation had begun is without merit.**

Rutherford claims that he was denied due process and deprived of a fair trial
when the trial court charged the jury on the law of accomplice liability on the second day
of deliberation.  (Pet. ¶ 12.B.)  Specifically, Rutherford makes three claims relating to the
accomplice liability charge.  First, he argues that there was not sufficient evidence to
warrant the supplemental charge.  (Id.)  Second, he claims that the introduction of a new
theory of liability on the second day of deliberation had a coercive effect on the jury.
(Id.)  Finally, Rutherford asserts that the new theory of liability denied him an opportunity
to present a defense as to the issue.  (Id.)

Normally, jury instructions in state trials are matters of state law.  Hallowell v.
Keve, 555 F.2d 103, 106 (3d Cir. 1977).  Thus, state court jury instructions are typically
not cognizable in federal habeas review.  Grecco v. O'Lone, 661 F. Supp. 408, 412
(D.N.J. 1987) (citing Henderson v. Kibbe, 431 U.S. 145 (1977)).   In fact, an instruction
is reviewable by a federal habeas court only when it is so prejudicial as to violate
federally protected rights.  Hallowell, 55 F.2d at 106 (citing Cupp v. Naughten, 414 U.S.
141, 146 (1973)); see also Grecco, 661 F. Supp. at 412 ("Only where the giving of an
instruction is so prejudicial as to amount to a violation of due process and fundamental
fairness will a habeas corpus claim lie").  In this case, Rutherford's claims as to the
supplemental instruction on accomplice liability present no grounds for habeas relief.

Accomplice liability was never alleged in the indictment against Rutherford.  (See RA1).  Nonetheless, the State originally considered requesting a jury instruction on such liability.  Immediately prior to the presentation of the defense, however, the State moved to withdraw its request to charge the jury on the law of accomplice liability.  (RA5: 4T8-9 to 19.)  The trial court acceded to the State's request.  (Id.)  Rutherford then presented an alibi defense in which he claimed that he could not have been the perpetrator because he was out of town on the evening of the robbery.  (RA5: 4T et seq.)  Thus, Judge Natal's initial charge to the jury included nothing on the elements of accomplice liability.  (See RA6: 5T62-7 to 116-12.)

Shortly after the jury began deliberation, it sent a note to the court which stated in pertinent part: "[Did Trooper] Toth testified that the two shell casings definitely came from two different guns."  (RA6: 5T122-7 to 9.)  Following this, the State moved to renew its request for an instruction on accomplice liability.  (RA7: 6T3-11 to 12.)  The State argued that there was a rational basis in evidence to support the instruction and that the jury's question about Trooper Toth's testimony amounted to a request for an instruction in accomplice law.  (RA7: 6T3-12 to 5-24.)  Defense counsel objected and the court sustained.  (RA7: 6T6-1 to 22.)  While Judge Natal indicated that the court had the right to supplement its charge in response to a jury question, he found that this particular inquiry was nothing more than a request for clarification of Trooper Toth's testimony.  (RA7: 6T6-23 to 7-22.)  He indicated, however, that if the jury posed a specific question

dealing with accomplice liability, he would consider issuing a supplemental charge on that subject.  (RA7: 6T7-12 to 14.)

A short time later, the court received another note from the jury, which read, "To be guilty of any of the charges under Count 1, does the defendant have to be the person who fired the fatal bullet?"  (RA7: 6T21-4 to 7.)  Judge Natal then informed counsel that he intended to charge the jury on accomplice liability.  (RA7: 6T21-8 to 14.)  Specifically, he stated the following:

> Counsel, I will charge [the jury] on accomplice liability inasmuch as it is their request and it isn't the State changing its theory.  The jury apparently wants to know what the law is concerning the facts as they find them to be and the only reason I indicate I didn't charge it originally was because the State said they didn't– did not request it.  I would not have charged it but for the jury at this point steering the Court in that direction and asking that question.  I think it's my obligation to provide them with the law and they should be applying that law to the facts as they find them to be.

(RA7: 6T23- 2 to 12.)

Judge Natal then charged the jury on accomplice liability as applied to counts one, three, four, and five.  In addition, he charged the jury on nonslayer participation felony murder as to count two.  Prior to explaining the actual elements of accomplice liability, however, he admonished the jury with the following warning:

> You should not infer from the fact the Court is giving you this charge that the Court in any way wishes you to base your determination on that decision that the defendant was not the one who fired the shot.  It's up to you to make that determination as triers of fact.

(RA7: 6T24- 21 to 25.)  He later repeated this admonition in the course of giving the

-15-

actual supplemental charge.  (RA7: 6T33-2 to 4.)  Defense counsel objected to the

supplemental charge being given after the jury had begun deliberation.  (RA7: 6T21- 22

to 22-10.)  However, there was no objection as to the substance of the charge itself.

(RA7: 6T38-15 to 18.)

When a jury requests clarification, the trial court is obligated to attempt to

eliminate the jury's confusion.  Grecco, 661 F. Supp. at 413.  Despite this obligation, a

jury question that implicates a given instruction on the law is not dispositive as to whether

that instruction should be given.  United States v. Fedroff, 874 F.2d 178, 186 n.7 (3d Cir.

1989).  Rather, the right to a given instruction depends solely on the evidence adduced at

trial.  Id.

Contrary to Rutherford's claim, the record indicates that there was sufficient

evidence to justify the supplemental charge on accomplice liability.  First, the State

presented ballistics evidence and expert testimony that the two shell casings found at the

scene had most likely been discharged from different firearms.  (RA4: 5T110-16 to 118-

5.)  In addition, the State presented testimony to the effect that Rutherford had originally

planned to do the robbery with Anthony Mitchell before soliciting Saleem Matthews.

(RA3: 2T112-9 to 113-1.)  Further, Thomas Trolio testified that he told defense

investigators that Saleem Matthews bragged to him that Matthews and Mitchell

committed the robbery, and that Mitchell had been the shooter.  (RA4: 3T89-15 to 90-1.)

Trolio indicated that Rutherford put him up to telling investigators the story about

Matthews and Mitchell; thus, the jury could rationally have believed that any number of scenarios occurred.  For example, the jury could have concluded that Rutherford, Matthews, and Mitchell each played a role in the robbery, and that either Matthews or Mitchell had actually fired the fatal shot.

There is evidence in the record from which the jury could infer that Matthews had an interest in protecting Mitchell by omitting the latter's involvement from his account of the robbery in which he implicated only Rutherford and himself.  Specifically, Trolio's testimony suggested that Matthews was indebted to Mitchell after the latter protected the former during the robbery.  (RA4: 3T89-15 to 90-1.)  Rutherford himself testified that this is precisely what Trolio had told him.  (RA5: 4T79-1 to 80-9.)  Moreover, there was evidence from which the jury could have inferred that Tanya Money, who placed Rutherford at the scene of the crime, only selectively recounted her observations as to the events of that evening.  For example, Trolio's testimony suggested that Money was upset with Rutherford for his failure to compensate her for a tip she gave him about the robbery.  (RA4 3T95-2 to 98-19.)  On these bases, the evidence in the record rationally supports the trial court's supplemental instruction on accomplice liability.

Relatedly, Rutherford's claim that the supplemental instruction on accomplice liability had a coercive effect on the jury's deliberation is without merit.  While this Court is unaware of any Supreme Court or Third Circuit case directly on point factually, an examination of precedent dealing with coercive jury instructions is nonetheless

informative.

The leading case deciding when a supplemental jury charge is coercive is Allen v. United States, 164 U.S. 492 (1896).  There, the Supreme Court upheld what would become known as the Allen charge– a supplemental instruction to a deadlocked jury in which the court recommends that jurors with views in the minority consider whether their views might be erroneous.  See United States v. Eastern Medical Billing, Inc., 230 F.3d 600, 602 n.1 (3d Cir. 2000).  Nonetheless, in United States v. Fioravanti, 412 F.2d 407 (3d Cir. 1969), the Third Circuit developed a prophylactic rule prohibiting use of an Allen charge because of its power to coerce "minority" jurors into yielding their points of view. Specifically, the court stated the following:

> [A]lthough dictates of sound judicial administration tend to encourage the rendition of verdicts rather than suffer the experience of hung juries, nevertheless, it is a cardinal principle of the law that a trial judge may not coerce a jury to the extent of demanding that they return a verdict.

Id. at 416.  The Fioravanti court indicated, however, that a charge would not be coercive if it contained language urging jurors to reconsider their own view but to not surrender their honest convictions solely because of other jurors' opinions, or for the mere purpose of returning a verdict.  Id. at 420 n.32.

Furthermore, while the Supreme Court held in Allen that the "minority" jury charge was not coercive, it later declared improper a supplemental charge to a deadlocked jury in which the trial court instructed, "[y]ou have got to reach a decision in this case." Jenkins v. United States, 380 U.S. 445, 446 (1965).  Similarly, in United States v. Burley,

460 F.2d 998, 999 (3d Cir. 1972), the Third Circuit held unduly coercive a supplemental instruction in which a district judge told a deadlocked jury to consider the burdens and expense to the government of a new trial.

Admittedly, Allen and its progeny dealt with one specific type of supplemental instructions to a deadlocked jury. Nonetheless, these cases are illustrative of a broader theme about the attributes of a coercive supplemental jury charge. A supplemental instruction is coercive if its actual or reasonably possible effect is to force the jury's hand or move the jury in a certain direction with respect to the deliberation process. On the other hand, there is no coercion where a supplemental instruction provides additional guidance, but does not lead the jury to a given conclusion. The supplemental charge at issue in this case falls into the second category.

Rutherford's claim of a coercive supplemental charge is fatally flawed in that it ignores the context in which Judge Natal issued the instruction. For example, the court did not charge the jury *sua sponte*. In fact, the judge refused the State's request to issue the instruction after the jury inquired about the substantive content of Trooper Toth's testimony. Rather, it was only after the jury asked a specific question that directly implicated the law of accomplice liability that he decided to give the instruction. (See RA7: 6T21-4 to 7.) Furthermore, there is no indication that the jury was deadlocked on any issue such that the supplemental charge might have been interpreted as an indication that deliberation must continue even if reaching a verdict was impossible. Finally, and

-19-

most importantly, Judge Natal went out of his way to stress to the jury that it was not to

infer from the supplemental instruction that the court advocated any particular conclusion

on the issue.  (See RA7: 6T-21 to 25; RA7: 6T33-2 to 4.)

Similarly, Rutherford's claim that the supplemental instruction deprived him of an

opportunity to present a defense lacks merit.  Under both Third Circuit precedent and

New Jersey law, a defendant indicted as a principal may be found guilty as an accomplice

as long as evidence produced at trial supports that finding.  See, e.g., United States v.

Provenzano, 334 F.2d 678, 691 (3d Cir. 1964); State v. Mancine, 590 A.2d 1107, 1120

(N.J. 1991).  This is true even where the indictment does not expressly allege accomplice

liability.  State v. Boyer, 534 A.2d 744, 752 (N.J. Super. Ct. App. Div. 1987).

In light of the above, Rutherford cannot claim that he lacked an opportunity to

present a defense that was tailored to possible accomplice liability given the nature of the

case against him.  Further, Rutherford's claim is particularly unavailing because he

presented an alibi defense at trial.  That is, he claimed, and called witnesses who testified,

that he was nowhere near the scene on the night of the robbery.  (See RA5: 4T et seq.)  It

is difficult to see how Rutherford was affected by the instruction on accomplice liability

in light of this defense.  In other words, if Rutherford's defense was that he was not at the

scene, it does not matter whether the jury considered a theory of accomplice liability as

opposed to principal liability.  The bottom line from Rutherford's point of view was that

he was out of town at the time of the criminal activity.

The trial court's supplemental instruction on accomplice liability presents no basis for federal habeas relief.  The instruction was adequately supported by the evidence in the record.  In addition, the charge was in no way coercive as it was given in direct response to a jury inquiry and was prefaced by the court's admonition that the jury was not to infer from the charge that the court was advocating any particular finding with respect to the issue.  Finally, the nature of Rutherford's alibi defense was in no way affected by whether the jury considered a factually based theory of liability as an accomplice versus liability as a principal.  The Appellate Division's decision– holding that the trial court did not err in giving the supplemental instruction– was therefore neither contrary to, nor an unreasonable application of, Supreme Court or Third Circuit case law.  For these reasons, Rutherford's application for habeas relief fails as to this claim.

### D.    Rutherford's counsel was not ineffective.

Rutherford claims that his counsel was so ineffective as to implicate his right to counsel under the Sixth Amendment.[3]  Two possible bases for the ineffective assistance claim are raised.  First, Rutherford asserts that his counsel failed to pursue plea negotiations with the State and failed to adequately inform him of the State's plea offer.  (Pet. ¶ 12.C.)  Second, he claims that counsel did not advise him of a potential conflict of

---

[3] Note that Rutherford's ineffective assistance of counsel claim relates only to his representation at the pre-trial and trial level by Charles Sandilos.  (See Pet. ¶ 12.C.)  Rutherford had alternate representation at all other stages of state proceedings related to this matter.  (See Pet. ¶ 15; Answer for Respondents, ¶ 15.)

interest until the first day of trial and did not adequately inform him of his right to opt for new counsel.  (Pet. ¶ 12.D.)

The Supreme Court announced the standards for establishing a claim of ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  The Court explained that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  466 U.S. at 686; see also Morrison v. Kimmelman, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect").  Under the Strickland analysis, a habeas petitioner claiming ineffective assistance must demonstrate two points:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687.  Thus, Rutherford must show both incompetence by his counsel and that his defense was prejudiced by this incompetence.  Id.  (emphasis added). The Strickland Court was careful to point out that "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Strickland,

466 U.S. at 690.

In applying the <u>Strickland</u> standard, the Third Circuit has been quite deferential to counsel's discretion as to trial strategy and tactics. For example, in <u>Parrish v. Fulcomer</u>, the court explained that "[i]n reviewing counsel's performance, our scrutiny must be 'highly deferential,' and not 'second-guess counsel's assistance after conviction.'" 150 F.3d 326, 328 (3d Cir. 1998) (quoting <u>Strickland</u>, 466 U.S. at 689). The court went on to note that it "must 'judge the reasonableness of counsel's challenged conduct on the facts of the particular case, reviewed as of the time of counsel's conduct.'" <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 690). It is against this deferential backdrop that Rutherford makes his claim of ineffective assistance. For the reasons discussed below, the claim is without merit.

### i. Plea Negotiations

Rutherford first claims ineffective assistance of counsel because counsel allegedly failed to pursue plea negotiations with the State and keep Rutherford abreast of the State's plea offers. There is no doubt that the plea bargain stage is a critical stage with regard to the right to effective assistance of counsel. <u>United States ex rel. Caruso v. Zelinsky</u>, 689 F.2d 435, 438 (3d Cir. 1982).

The Third Circuit has stated that the first prong of the <u>Strickland</u> test is satisfied with respect to plea offers under two circumstances. First, an attorney's conduct is incompetent when the plea offer is not communicated by the attorney to the defendant.

Zelinsky, 689 F.2d at 438.  Second, incompetence exists where plea information is communicated but is so incorrect and insufficient that it hampers the defendant's ability to make an intelligent decision with respect to the offer.  United States v. Day, 969 F.2d 39, 43 (3d Cir. 1992).  With respect to the second prong of Strickland, the Circuit has stated that "prejudice in fact . . . requires consideration of whether [the petitioner] would have accepted the alleged plea offer and whether the district court would have approved it."  Id. at 45.

In United States v. Barber, this Court applied these principles when it denied the habeas petition of an individual who claimed, in part, that his counsel never discussed the possibility of a guilt plea with him.  808 F. Supp. 361 (D.N.J. 1992), aff'd, 998 F.2d 1005 (3d Cir. 1993).  This Court found that these claims lacked credibility in light of a record which indicated that petitioner Barber refused to discuss the issue of a plea offer with his counsel as the former was convinced of impending victory with respect to a suppression hearing and because he was persistent in his denial of guilt.  Id. at 375 n.42.  In this case, Rutherford's claim as to the plea negotiation process similarly lacks credibility.

As in Barber, the record in this case indicates that Rutherford was not interested in pursuing or accepting a plea bargain.  At the PCR hearing, Rutherford's counsel, Charles Sandilos, testified that his client did not want to enter plea negotiations and instead wished to go to trial because he claimed not to have committed the crime.  (RA28: 8T46-17 to 24; RA28: 8T63-13 to 22; RA28: 8T70-18 to 71-6.)  Sandilos further testified that

-24-

had a plea offer been made, he would have strongly advised Rutherford to accept it due to the nature of the case against him.  (RA28: 8T64-11 to 19.)  In response to Rutherford's claim that he had sent counsel two letters in which he indicated a desire to pursue a plea agreement, Sandilos testified that he had never received any such correspondences. (RA28: 8T64-20 to 65-11.)  Moreover, Sandilos testified that on the third day of the trial, Rutherford provided him with another possible witness whom Sandilos had investigated– an action Sandilos testified he would not have engaged in if Rutherford wished to plead guilty.  (RA28: 8T68-17 to 69-5.)

At the conclusion of the PCR hearing, Judge Natal made several key findings with respect to the plea negotiations.  First, he found that Rutherford was not a credible witness during the hearing.  (RA28: 8T82-8 to 9.)  He also found that Rutherford did not write the letters indicating interest in a plea deal when he claimed to have and that he did not send those letters to Sandilos.  (RA28: 8T83-10 to 14; RA28: 8T91-22 to 3.)  Further, the court was unconvinced that there ever was a plea deal offered to Rutherford by the State.  (RA28: 8T83-2 to 5.)  The court did, however, find that if such an offer was made, Sandilos, whom the court deemed credible, would have immediately informed Rutherford of the possible agreement.  (RA28: 8T83-6 to 9.)

Ultimately, Judge Natal stated that he believed Rutherford had no interest in pleading guilty and, rather, wished to go to trial.  (RA28: 8T84-4 to 5; RA28: 8T84-14 to 15; RA28: 8T91-19 to 21.)  In support of this conclusion, he noted that Rutherford never

indicated to the trial court a desire to plead guilty despite ten separate pre-trial appearances.  (RA28: 8T82-9 to 19.)  Further, the court noted the trial transcript in which Rutherford explained that, prior to trial, he wrote co-defendant Saleem Matthews warning him not to talk to police or take any plea deals because "I felt I didn't commit the crime so why should I take a deal."  (RA28: 8T92-10 to 15.)  Judge Natal interpreted this statement along with the correspondences to Matthews about which Rutherford was testifying to support the conclusion that Rutherford had no interest in engaging in plea negotiations.  (RA28: 8T92-23 to 93-1.)

In light of the facts discussed above, Rutherford has failed to make out a claim for ineffective assistance of counsel with respect to plea negotiations.  Judge Natal concluded that it was unlikely that a plea offer was ever made in this case.  Nonetheless, the record indicates that if an offer was made, Sandilos would have diligently communicated that offer to Rutherford.  Thus, Rutherford has failed to satisfy the first prong of the Strickland test.  The record also demonstrates that Rutherford had no interest in pursuing a plea agreement and instead felt that he could avoid liability altogether by going to trial.  Thus, even if a plea offer was made, and even if Sandilos communicated the terms of that offer to Rutherford, it is highly unlikely that he would have accepted counsel's probable advice to take the deal.  Rutherford has therefore also failed to satisfy the second prong of the Strickland test.

ii.  Conflict of Interest

Rutherford additionally claims that his counsel was ineffective because he allegedly failed to disclose a conflict of interest until the first day of trial and inadequately informed Rutherford of his right to new counsel.  This claim arises out of the fact that Rutherford's counsel, Charles Sandilos, had previously represented Richard Hightower, an individual whom the State named as a possible witness but who ultimately did not testify.

The Supreme Court has addressed the issue of counsel's possible conflict of interest in Cuyler v. Sullivan (Sullivan I), 446 U.S. 335 (1980), albeit in the context of a multiple representation case.  In that case, the Court held that a criminal defendant who alleges a violation of his right to counsel's undivided loyalty "must establish that an *actual* conflict of interest *adversely* affected his lawyer's performance."[4]  Id. at 350 (emphasis added).  On remand in that case, the Third Circuit stated the test for a conflict of interest as follows:  "To prove a conflict of interest violative of the sixth amendment, a claimant must prove (1) multiple representation that (2) created an actual conflict of interest that (3) adversely affected the lawyer's performance."  Sullivan v. Cuyler (Sullivan II), 723 F.2d 1077, 1084 (3d Cir. 1983).  Subsequently, however, the Court of

---

[4] Unlike in other ineffective assistance of counsel situations, however, a habeas petitioner who claims that his counsel had a conflict of interest need not go on to the second prong of Strickland and demonstrate the probable effect upon the outcome of trial. See, e.g., Sullivan I, 466 U.S. at 349-50; Mickens v. Taylor, 535 U.S. 162, 174 (2002).

Appeals indicated that its holding in Sullivan II was not to be construed so narrowly as to only allow for a conflict of interest claim where the source of the potential conflict stems from multiple representation.  See Government of Virgin Islands v. Zepp, 748 F.2d 125, 135 (3d Cir. 1984).  Therefore, a conflict claim may lie where the alleged conflict arises in the former client context.

In addition, a defendant may voluntarily waive his right to conflict-free counsel. See Holloway v. Arkansas, 435 U.S. 475, 483 n.5 (1978) ("By inquiring in Glasser [v. United States, 315 U.S. 60 (1942)] whether there had been a waiver, the Court . . . confirmed that a defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests"); see also United States ex. rel. Hart v. Davenport, 478 F.2d 203, 210 (3d Cir. 1973) (internal citations omitted) ("Recognizing that the right to . . . [conflict-free] assistance of counsel may be waived, we have refused to find any such waiver from a silent record").  This waiver, like that of any constitutional right, must be made knowingly, intelligently, and with awareness of its likely consequences.  See United States v. Dolan, 570 F.2d 1177, 1181 (3d Cir. 1978).  Whether the waiver is knowing and intelligent "should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record."  Id. (quoting Glasser, 315 U.S. at 70, in turn quoting Johnson v. Zerbst, 304 U.S. 458, 465 (1938)). "For a trial judge to find that a waiver is knowing and intelligent, he must be satisfied that the defendant is aware of the foreseeable prejudices his attorney's continued

representation could entail for his trial, and possible detrimental consequences of those

prejudices." Dolan, 570 F.2d at 1181.

The Dolan court stated that the trial court should consider the waiver in this

manner:

> the [trial] court should address each defendant personally and forthrightly advise
> him of the potential dangers of representation by counsel with a conflict of interest.
> The defendant must be at liberty to question the [trial] court as to the nature and
> consequences of his legal representation.  Most significantly, the [trial] court
> should seek to elicit a narrative response from each defendant that he has been
> advised of his right to effective representation, that he understands the details of
> his attorney's possible conflict of interest and the potential perils of such a conflict,
> that he has discussed the matter with his attorney or if he wishes with outside
> counsel, and that he voluntarily waives his Sixth Amendment protections.  It is, of
> course, vital that the waiver be established by 'clear, unequivocal, and
> unambiguous language.'

Id.  Finally, the Third Circuit has held that a criminal defendant, once having made a

knowing and intelligent waiver, cannot subsequently attack his conviction premised on

the assertion of a conflict.  United States v. Flanagan, 679 F.2d 1072, 1076 (3d Cir.

1982), rev'd on other grounds, 465 U.S. 259 (1984).

In this case, Rutherford's conflict of interest claim lacks merit.  During

Rutherford's PCR hearing, Judge Natal found that the record sufficiently indicated that

Hightower was not likely to have been called as a witness despite the fact that his name

appeared on the State's witness list.  (RA28: 8T93-18 to 20.)  Thus, the court concluded,

there was no actual conflict in this case, only a potential conflict.  (RA28: 8T93-20 to 21.)

Even if there was an actual conflict, however, Rutherford still has not made out his claim

under <u>Sullivan I</u> because he points to nothing in the record which indicates that his

counsel's prior representation of Hightower had an adverse effect on the competency of

his own representation.

Moreover, even if the prima facie case for conflict of interest had been made out,

the record indicates that Rutherford waived his right to conflict-free counsel early in his

trial.  Rutherford claims that he did not fully understand the nature of the conflict or its

potential impact upon his representation.  (<u>See</u> Pet. ¶ 12.D.)  However, the record

indicates that this was not the case.

At trial, Judge Natal reviewed with Rutherford the possible conflict in the

following exchange:

> MR. SANDILOS:  That's correct.  Judge, may be issues as to some of the
> prosecutor's witnesses under Balthrop.
> THE COURT:  Do you know of any at this point?
> MR. SANDILOS:  Yes,  Richard Hightower– and probably ought to bring this up
> now, Judge.  There is–  Judge, Richard Hightower had two convictions: One for
> possession of C.D.S. within 1,000 feet of a school; and for receiving stolen
> property.  He received a concurrent flat three by Judge Colalillo.  That was done
> June 25, 1993.
> I want to bring to the Court's attention that I've discussed this with my client
> already that I was Mr. Hightower's lawyer.  I believe that Mr. Rutherford wishes to
> waive any conflict there might be in this and proceed with this trial today.
> THE COURT:  Mr. Rutherford, have you discussed that with Mr. Sandilos?
> THE DEFENDANT:  Yes.
> THE COURT:  Do you wish to waive any conflict there would be and proceed?
> THE DEFENDANT:  Yes.

(RA2:  1T11-4 to 23.)

-30-

Although this exchange was not as thorough as the model envisioned by the <u>Dolan</u> court, the underlying effect of Judge Natal's inquiry was the same– the dialogue sufficiently ensured that Rutherford was properly advised of the possible conflict and that he knowingly and intelligently wished to waive his claim to it.  Judge Natal's handling of the waiver issue at trial was therefore neither contrary to, nor an unreasonable application of, Supreme Court precedent or interpretations thereof by the Third Circuit.

Furthermore, at the PCR hearing, Judge Natal found that Rutherford was properly advised of the conflict and proceeded to waive it.  (RA28: 8T94-4 to 7.)  During the hearing, Sandilos testified that he likely advised Rutherford of his representation of Hightower and that he did not believe an actual conflict arose.  (RA28: 8T45-21 to 46-1; RA28: 8T50-2 to 21.)  Moreover, Rutherford himself testified during the hearing that he was made aware of the possible conflict by Sandilos, though he claimed to not fully understand it.  (RA28: 8T22-23 to 23-2.)  However, it must be reiterated that Judge Natal found that Rutherford was not a credible witness.  (RA28: 8T82-8 to 9.)  In addition, there is little question from the trial court colloquy that Rutherford comprehended the conflict issue.

Thus, the record as a whole reasonably supports the conclusion that even if there was an actual conflict in this case, Rutherford knowingly and intelligently waived it. Because federal habeas courts must presume that state court findings of fact are correct unless not fairly supported in the record, <u>see</u> <u>Scarborough v. Johnson</u>, 300 F.3d 302, 305

(3d Cir. 2002), this Court concludes that there is no basis for Rutherford's ineffective assistance of counsel claim based upon a conflict of interest with a former client.

For the reasons discussed above, this Court therefore holds that Rutherford has not made out a viable claim for ineffective assistance of counsel under either the plea negotiation theory or the conflict of interest theory.

> **E.     Rutherford's claim that the result of his post-conviction relief hearing was in some way violative of his rights under the U.S. Constitution is meritless.**

Rutherford's final claim in support of habeas relief maintains that the result in his PCR hearing was erroneous and thus somehow in violation of the United States Constitution.  (Pet. ¶12.E.)  Rutherford claims that the PCR court: 1) erred in denying relief with respect to the plea negotiations; 2) erred in rejecting the conflict of interest claim; and 3) "erred in baring the testimony of present and available witnesses."  (Id.) The third related issue arises out of Rutherford's claim during the PCR hearing that his counsel was ineffective insomuch as he failed to call certain witnesses during trial.  It appears that Rutherford is not asserting that the alleged failure to call certain witnesses presents a basis for an ineffective assistance of counsel claim.  Instead, Rutherford seemingly argues that the PCR court was incorrect in disallowing those witnesses to testify at the PCR hearing.  For the reasons discussed below, these claims do not present cognizable grounds for habeas relief.

The Supreme Court addressed the limits imposed on a federal habeas court in Woodford v. Visciotti, 537 U.S. 19 (2002).  In that case, the Court reversed a decision of the Ninth Circuit Court of Appeals which had affirmed a grant of habeas relief on the basis of ineffective assistance of counsel.  Id. at 20.  The petitioner had filed for habeas relief first in the California Supreme Court, which appointed a referee to hold an evidentiary hearing and make findings of fact.  Id. at 21.  The state supreme court ultimately denied the petition, assuming that the petitioner's trial counsel provided constitutionally inadequate representation during the penalty phase, but nonetheless concluding that this did not prejudice the jury's sentencing decision.  Id.  The petitioner then filed a habeas petition in federal district court, which was granted and subsequently affirmed by the Ninth Circuit.  Id. at 21-22.

Upon review, the United States Supreme Court reversed, explaining that the California court's decision was consistent with its holding in Strickland.  The Court further ruled that the Ninth Circuit mischaracterized the state court's decision which, the Supreme Court said, "expressed and applied the proper standard for evaluating prejudice."  Id. at 22.  The Woodford Court noted that "[t]he California Supreme Court's opinion painstakingly describes the Strickland standard."  Id. at 23.  The Court went on to state that the Court of Appeals' "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law [and] it is also incompatible with §2254(d)'s 'highly deferential standard for evaluating state-court rulings,' which demands

-33-

that state court decisions be given the benefit of the doubt." Woodford, 537 U.S. at 24 (internal citations omitted). The Court then stated the following:

> Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied Strickland incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied Strickland to the facts of his case in an objectively unreasonable manner. An 'unreasonable application of federal law is different from an incorrect application of federal law.' The Ninth Circuit did not observe this distinction, but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d).

Id. at 24-25 (internal citations omitted). Thus, it does not matter that a federal habeas court would have reached a different conclusion from the state court as to the application of federal precedent to the facts of the case. Rather, what Woodford makes clear is that habeas relief can only be granted if the state court's application of federal precedent to the facts before it was objectively unreasonable. The instant matter presents no such situation.

Like in Woodford, the state courts in this case have painstakingly adhered to Supreme Court precedent by correctly applying the Strickland standard when evaluating Rutherford's ineffective assistance claims during the PCR hearing. Judge Natal's findings at the hearing's conclusion correctly identified the Strickland standard. (RA28: 8T87-25 to 89-8.) Further, the findings as a whole constitute a reasonable application of that standard. Likewise, in denying Rutherford's appeal of the denial of post-conviction relief, the Appellate Division specifically referenced and applied the Strickland standard. (RA34: slip op. at 3.) As directed by Woodford, this Court must presume that the state

-34-

courts knew and properly applied the relevant law in this case.  The record fully supports

that presumption.  Accordingly, Rutherford has failed to demonstrate that the state courts

applied <u>Strickland</u> in an objectively unreasonable manner.

Finally, Judge Natal's refusal during the PCR hearing to permit certain witnesses

to testify in connection with Rutherford's claim that his counsel wrongly failed to call

those witnesses during trial is not cognizable on federal habeas review.  This decision

rested on an interpretation of <u>State v. Cummings</u>, 728 A.2d 307, 315 (N.J. Super. Ct. App.

Div. 1999), which itself read N.J. R. Gen. Application 1:6-6 to require PCR petitioners to

support factual assertions outside the record with affidavits based on the personal

knowledge of the affiant.  It appears from the record that Rutherford did not comply with

Rule 1:6-6 to the extent that he failed to provide the PCR court with affidavits indicative

of what the witnesses' testimony would have been if called at trial or even whether the

witnesses were available to testify in the first place.  (RA28: 8T5-20 to 9-13.)

The Supreme Court has stated that "it is not the province of a federal habeas court

to reexamine state-court determinations on state-law questions." <u>Estelle v. McGuire</u>, 502

U.S. 62, 67-68 (1991).  This is generally true even where the state court incorrectly

applied state law.  <u>Id.</u> at 71.  Rather, a federal habeas claim will lie only where state court

determinations violated some federally protected right.  <u>Id.</u> at 68.  In a similar vein, the

Third Circuit has stated the following:

> Our review of a federal habeas corpus petition is limited to remedying
> deprivations of a petitioner's federal constitutional rights. *We can take no*

> *cognizance of non-constitutional harm to the defendant flowing from a state's violation of its own procedural rule*, even if that rule is intended as a guide to implement a federal constitutional guarantee.

Wells v. Petsock, 941 F.2d 253, 256 (3d Cir. 1991) (emphasis added); see also  Smith v. Zimmerman, 768 F.2d 69, 73 (3d Cir. 1985) ("[A] 'mere error of state law' is not a denial of due process").

In the instant case, it is not for this Court to review on a habeas petition whether Judge Natal correctly applied state procedural law to disallow certain witnesses to testify at the PCR hearing.  As initially discussed, this constituted a question of state procedural law designed to ensure a fair and reliable hearing.  Even if the state court incorrectly applied its own procedural law, review of that decision is beyond the scope of this Court's authority absent a valid claim that the error somehow violated due process or another federally protected right.  Irrespective, the record indicates that Judge Natal carefully complied with state law on this issue, as did the Appellate Division on review.

For these reasons, Rutherford's habeas claims relating to any alleged errors made during the PCR hearing are denied.


### III.  CONCLUSION

For the reasons stated above, Petitioner Rutherford's § 2254 habeas application is denied.  Because Rutherford has not made a substantial showing of the denial of a constitutional right, no certificate of appealability will issue pursuant to 28 U.S.C. § 2253(c).  See Fed. R. App. P. 22(b)(1); 3d Cir. L.A.R. 22.2.  The accompanying Order

will be entered.

Dated: June 30, 2005                    /S/ Joseph H. Rodriguez
                                        JOSEPH H. RODRIGUEZ
                                              U.S.D.J.